## STATE v. MARES.

No. 7092.   Decided April 26, 1948.   (192 P. 2d 861.)

226

See 23 C. J. S., Criminal Law, sec. 1052. Voluntariness of confession admitted by court as question for jury, see note, 85 A. L. R. 870. See, also, 20 Am. Jur. 429.

*McCullough, Wilkinson & Boyce,* of Salt Lake City, for appellant.

*Brigham E. Roberts,* Dist. Atty., of Salt Lake City, *P. H. Neeley,* Co. Atty., of Coalville, *Grover A. Giles,* Atty. Gen., and *A. John Brennan,* Asst. Atty. Gen., for respondent.

LATIMER, Justice.

The defendant Eliseo J. Mares, Jr., was convicted of the crime of murder in the first degree, and stands sentenced to death by shooting. He appeals from the judgment and sentence as pronounced by the trial court.

The evidence which deals with the events leading up to the meeting of the deceased and the defendant is not in dispute. We accept the version as given by the defendant which was substantially as follows: On or about April 29, 1946, the defendant, who had been previously inducted into the army, left his station at Gieger Field, Spokane, Washington, without permission, and after wandering about the country for a short time he returned to his home in Antonito, Colorado; defendant's father, who was a deputy sheriff, advised him to return immediately to his station; defendant left Antonito and upon arrival in Denver, Colorado, he stole a 1937 Packard sedan and started his journey to the west; he found a .32 calibre automatic pistol in the glove compartment of the car; defendant drove along U. S. Highway No. 30 until he reached a place about seven miles east of Sinclair, Wyoming. At this point the car developed motor trouble and it was discovered that a connecting rod had been broken; the car was towed into the town of Sinclair and a garage mechanic informed defendant the car could not be repaired; about one-half hour after defendant arrived at the garage a Ford car belonging to Jack Derwood Stallings was brought into the garage; the defendant struck up an acquaintanceship with Stallings, and the latter agreed to transport defendant to Ogden, Utah, if the defendant would help in repairing Stallings' automobile.

From this point up to the time deceased's body was placed in a ditch, the evidence for the most part consists of two versions of the same story, both versions having been detailed by the defendant. The evidence produced by the state consisted of the version given by the defendant to certain peace officers and the second version is the one recounted by the defendant while he was on the witness stand. The state's version will be detailed first.

According to the story given the peace officers by defendant, Stallings was driving the car from Evanston towards Ogden, Utah; when the car was at or near the Utah state line, Stallings awakened the defendant and told him they were about to enter the State of Utah; the defendant

had previously opened his suitcase, changed his shirt, and taken the gun out of his bag and laid it on the back seat of the car; when the car reached a point approximately one and one-quarter miles past the town of Echo, Utah, Stallings, intending to rest for awhile, pulled the car off to the side of the road and got out; prior to this time, defendant had made up his mind to kill Stallings; after Stallings got out of the car he bent over to fix his shoe lace, or to look at a tire; while Stallings was stooping over, the defendant took the gun, put his arm through the opened rear window of the car, took aim and shot Stallings; the projectile struck Stallings in the head and he fell to the ground; defendant then got out of the car, placed Stallings' body in the seat of the car, threw deceased's jacket over his head, turned the car around and drove it to a place known as Judd Hill; at this point, the car stopped and as there were a number of cars passing defendant who claims he was frightened that a car would stop and some of the occupants might come over and find Stallings' dead body in the car, took the body out of the car and placed it in an irrigation canal.

Defendant's version on the witness stand was substantially as follows: That between Sinclair, and Evanston, Wyoming, he and deceased had consumed a considerable quantity of whiskey; upon leaving Evanston, he was riding in the front seat of the Ford automobile beside Stallings, who was driving the car; that he had had too much to drink and fell asleep; the next thing he remembered was when Stallings awakened him at a roadhouse or tavern in Echo Canyon just before they got to the Utah state line; the car was stopped a little west of the tavern as there were five or six cars parked in front of the tavern; he and Stallings went in to buy some beer to take out, but the bartender refused to sell them any beer and told them that they had too much to drink already; Stallings then went outside and the defendant stayed on the inside for some time arguing with the bartender; defendant then left the tavern and when he got outside discovered Stallings was having a fight with some fellows on the outside; Stallings was on the ground

and a "big guy dressed like a cowboy with Levis and boots on" was kicking him; the defendant tried to stop the fight and one of the fellows threw him out of the fracas; the defendant went to the car, picked up a tire iron, came back to the scene of the fight and struck the fellow over the head with the tire iron; the fellow fell down and the defendant thought he had killed him; defendant was about to hit another of Stallings' attackers when he was hit over the head and knocked unconscious; the next thing he remembered he was going down Echo Canyon riding in the front seat beside Stallings; Stallings was bleeding on the left side of his face; he had a wild look in his eyes, and was driving the car very rapidly down the canyon; that Stallings' appearance and actions indicated that he was out of his head, due either to his drinking or the beating he had just received or both; defendant tried to get Stallings to stop the car but he got no response and Stallings kept driving the car faster and faster down the canyon; the defendant started hollering for help as the car careened down the canyon road; defendant then kicked Stallings' foot off the accelerator in an effort to slow down the speed of the car; in kicking Stallings' foot off the accelerator, defendant finally slowed the car down and when it came to a turn he grabbed the steering wheel and turned it off the road where it came to a stop against a bank, about a mile and a quarter west of the town of Echo; Stallings had a wild look on his face and defendant jumped into the back seat; Stallings then slid out from under the wheel and started toward defendant with a tire iron in his hand muttering that he would kill him; Stallings tried to get into the back seat to hit defendant with the tire iron; defendant pushed Stallings' hands off the seat twice, and when he could no longer resist him, defendant took the gun off the seat and fired a bullet through the space caused by the open right rear window; defendant did not think he hit Stallings with the bullet; Stallings crumpled on the ground in an unconscious condition; defendant picked Stallings up and put a Navy blouse or jacket around his neck and set him in the front seat; defendant intended to take Stallings

to a hospital in Salt Lake City, Utah, so he turned the car around and drove back to the junction of the highways or underpass, to go down the Coalville road as he had noticed a sign indicating the direction to Salt Lake City when they passed the junction; when they got to the little town of Hoytsville, the engine quit and the car stopped near a canal bridge; defendant felt for Stallings' heart beat and came to the conclusion that Stallings was dead; defendant then put the body in the canal ditch which at the time was not being used for carrying water.

From the time defendant placed the body in the ditch until he was given a preliminary hearing, the following detailed events transpired; as to these matters there is very little dispute, except as to whether or not defendant read a certain document signed by him and made certain admissions or confessions to the officers.

Before leaving the body in the canal, defendant searched the body and removed all means of identification; he then proceeded down Parley's Canyon into Salt Lake County; he apparently became confused in his directions and drove into Emigration Canyon; while in this canyon he throw away the gun, the deceased's clothes, identification bracelet and ring; he retained deceased's Navy discharge papers, billfold containing other identification papers and certificate of title to the car; defendant then proceeded through Salt Lake City and onto Ogden, Utah, where he went to a used car lot and attempted to sell the car. He encountered a short delay and while waiting, sauntered into a bicycle shop and discussed the sale of the car with the owner of the shop. A sale price was agreed upon and so the defendant and the purchaser proceeded to the Police Station where the officer on duty had the defendant execute an assignment of title. Defendant, to accomplish the transfer of title, forged deceased's name to the certificate and identified himself as the deceased by exhibiting the papers he had retained; defendant then sold the bicycle found in the back of the car for the sum of $5, and signed Stallings' name as seller to a certificate required by Ogden City; after transacting this

business, defendant went over to the Western Union and claimed the $35 which had been wired there for Stallings and obtained the money by use of the identification papers and by signing the name of Stallings on the receipt; defendant then purchased a bus ticket to Denver, Colorado, where he stayed for about ten days, before contacting his family, in Antonito; there his father advised him to return to his Army post; defendant's activities after this were not definitely established by the evidence, but on August 14, 1946, he returned to Ogden. While there he was identified by the purchaser of the car, and was apprehended by the police.

On August 18, 1946, defendant signed a statement giving an account of his association with and killing of the deceased, and on the 19th day of August, 1946, he accompanied certain law enforcement officers over the route travelled by him on the night of the killing, and identified the location of the places where part of the foregoing events transpired.

Defendant in this appeal has presented sixty-two assignments of error, but has consolidated them into six proposals. While a reading of the record convinces us that defendant's rights were in no way prejudiced, because of this being a first degree murder conviction, each of the six propositions will be discussed.

The first assignment questions the trial court's ruling in admitting evidence of deceased's temperate habits. Defendant's version from the witness stand was that he and the deceased consumed considerable whiskey while travelling across western Wyoming; that deceased ▮ became intoxicated and either from the effects of the whiskey, the fight at the tavern, or both, the deceased became a mad man and was threatening to kill the defendant with an automobile tire iron at the time defendant fired the shot; and that defendant believed he had to shoot in self-defense.

There were no eyewitnesses to the tragedy, and no evidence by any witness, other than by defendant, to the effect

that deceased had been drinking or that his acts and conduct were such that it might have inferred that he was, in any way, under the influence of liquor.

To rebut defendant's evidence of the deceased's having been intoxicated, the state called deceased's father and brother as witnesses. Over defendant's objection they were permitted to testify that they had lived with the deceased, knew his habits, and had never seen, heard, or known of deceased having ever taken a drink of liquor; that they had lived with him, except for the three to four years he was in the naval service; and that during his period of military service he came home on furlough and had been at home after his discharge.

The trial court did not err in permitting the state to offer this evidence to rebut the story told by the defendant. When the defendant introduced the issue of self-defense based on his theory that intoxication may have partly caused the deceased to have become temporarily insane and to have become a threatening aggressor in an attempted assault, the possibility or probability of defendant's story could be rebutted by the testimony of the habits or character of the deceased. The principle reason for the admissibility of such evidence is that it renders defendant's story more improbable. It would seem more probable that a person of abstemious habits would have been sober rather than drunk on a particular occasion.

Wigmore, in his work on Evidence, 3rd Edition, Vol. 1, p. 467, states the rule to be as follows:

"When the issue of self-defense is made in a trial for homicide, and thus a controversy arises whether the deceased was the aggressor, one's persuasion will be more or less affected by the character of the deceased; it may throw much light on the probabilities of the deceased's action." Quoting *Williams* v. *Fambro*, 30 Ga. 232, 233, 235.

In support of this rule he cites many cases dealing with the admissibility of evidence dealing with the character of a deceased person. This principle is discussed by this court

in the case of *State* v. *Vacos,* 40 Utah 169, 176, 120 P. 497, 500. Justice Frick, speaking for the court, said:

"\* \* \* Indeed, one cannot read appellant's testimony relating to the mental traits of the deceased without becoming convinced that the only purpose appellant could have had in view in making the statements was to impress the jury that the deceased was a man whose anger was easily aroused, that he was oppressive, and, when in anger, a violent and dangerous man. Under circumstances like those in the case at bar, the courts have frequently held that it is proper on rebuttal for the state to show that the deceased had the general reputation of being a quiet, peaceable, and law-abiding man. The rule in homicide cases is well and tersely stated in 6 Ency. Ev. 778, in the following words:

" 'The prosecution cannot show the deceased's peaceable character until it has been attacked by the defendant in some way, even when there is doubt as to whether the killing was done in self-defense. When, however, evidence as to his violent or dangerous character has been introduced, it is competent to show in rebuttal that he was reputed to be peaceable and law abiding. It is not necessary, however, that his character be attacked directly, but evidence as to his previous threats, his previous hostile conduct, or as to his attack upon the defendant at the time of the homicide has been held sufficient to warrant proof of his peaceable character.'

"The foregoing statement of the law is sustained, and applied by many decisions, and among others that could be cited upon this proposition we simply refer to the following: *Davis* v. *People,* 114 Ill. [86], 9⁄5, 29 N. E. 192; *State* v. *Vaughn,* 22 Nev. [285] 298, 39 P. 733; *Bowlus* v. *State,* 130 Ind. 227, 28 N. E. 1115. See, also, 21 Cyc. 908, where the prevailing rule is stated to be in accordance with the statement quoted from the Encyclopedia of Evidence, supra."

The same principle is involved in this action. The real question to be determined is, what did the deceased probably do? Defendant claims that partly because of his intoxication the deceased was threatening defendant's life. Evidence which would fairly tend to show the improbability of deceased having so acted would be relevant. The attack on the character of the deceased, could only be met by the state introducing evidence of his temperate habits. We believe the evidence admitted by the trial court, if believed by the jury, had a tendency to contradict the evidence of intoxication presented by the defendant, and was admissible as

rebuttal evidence. The fact that deceased was away from home during the time he was in the naval service did not render the evidence inadmissible. The trial judge concluded the association between the deceased and his father and brother was of sufficient duration and continuity to permit these witnesses to testify as to deceased's habits. The evidence being relevant and competent, the weight to be given it was for the jury to decide.

Defendant next presents and argues that the trial court committed prejudicial error in permitting the state to introduce incompetent evidence to establish the corpus delicti. This proposition can be subdivided into four items. The first involves the testimony of Dr. F. G. Reese in regard to powder burns. The second deals with certain hypothetical questions asked Dr. Oldham. The third raises the question of error in permitting Dr. Oldham to read from his autopsy report. The last involves the correctness of the trial court's ruling in permitting a small piece of bone to be introduced in evidence and permitting a witness to testify as to lead markings on the bones.

Before dealing with each of these items, we consider it advisable to refer briefly to some of the facts not previously mentioned. The body of Stallings was placed in the canal on the 24th day of June, 1946, and it was not found until July 9, 1946. Upon discovery, the body was moved to an undertaker's parlor and an autopsy performed. The body was badly decomposed, puffed up about twice its normal size, and fly-blown. A wound and a hole were found on the right side of the head, but no bullet slug was found inside the cranial cavity and no exit hole was located. The right eye was out of its socket and was dangling on the right cheek. Without reference to any admission or confession by the defendant, it was established by the state that the person whose lifeless body was found in the canal met his death through force and violence.

In order to identify the corpse, finger prints were taken from the body and forwarded to Washington, D. C., for identification. The identity of the body was established by

the usual finger print comparison. In addition, the ownership of the Navy jacket found near the body as well as the ownership of the car and the bicycle all established that the deceased was John Derwood Stallings. Having identified the deceased and having established his death by violent means, the state proceeded to establish shooting as the cause of death and in doing this introduced the evidence which defendant objected to and now insists was incompetent.

Dr. F. J. Reese, a dentist of some 27 years' practice, was present during the autopsy. Over the objection of the defendant, Dr. Reese testified that he observed pittings surrounding the wound in the head of deceased, and that in his opinion the pittings were powder burns. Defendant's objections to the admission of this testimony appear to be twofold. The first that the witness was not qualified to testify as to the markings, and the second that his testimony is contrary to the testimony of other persons including two doctors and an undertaker who were present. As to the latter ground, the other witnesses testified they did not see any markings, but granting a dispute in the evidence, this is merely a conflict in the evidence for the jury to determine and in no way affects the admissibility of the evidence.

Dr. Reese, in the voir dire examination to determine his qualification to testify as to powder burns, admitted that in his practice he had on only two or three occasions observed similar markings on a human body. He had, however, taken certain anatomical courses at Northwestern University and had a four-year course in subjects required in the school of dentistry. Even though the doctor's experience with powder marks had been limited and the body was decomposed, these were items which go to the weight to be given the evidence of the doctor, and not to his competency to testify. Permitting Dr. Reese to testify to the powder burns was a ruling within the discretion of the trial judge and the record does not indicate an abuse of this discretion.

Appellant raised no question about the qualification of Dr. Oldham as a physician and surgeon, but did object to his testimony that the hole in the skull appeared to have been made by a bullet slug, and that a slug going through the skull at the place indicated would cause immediate death. The trial court overruled defendant's objections and permitted the doctor to testify. In so doing the court committed no error.

Permitting a portion of Dr. Oldham's autopsy report to be introduced in evidence was not prejudicial. In the trial of the action the doctor was cross-examined as to his not finding either an exit opening for the slug, or the slug itself. He was also cross-examined as to his failure to testify at the preliminary hearing about certain markings on the floor of the middle fascia of the skull. Other claimed inconsistencies in his previous statements with respect to the course of the bullet were called to his attention. Apparently the purpose of this cross-examination was to establish that the doctor had changed his theory on the course of the bullet since the time of his previous statement. On redirect examination, the state's attorney offered the complete autopsy report made by Dr. Oldham at the time of the autopsy. This was objected to by the defendant's attorney and the objection was sustained. The court did, however, permit one part of the report to be read. This part was the information showing the doctor's original findings on the course of the bullet which was consistent with the evidence given by the doctor at the trial. The portion read was admissible as ruled by the court.

Admission of the piece of bone in evidence was neither erroneous nor prejudicial. The bone was identified by witnesses in the preliminary hearing, was introduced by the state as an exhibit in that hearing and was transferred to the district court as an exhibit. In the district court it was identified by both Drs. Reese and Oldham, at least sufficiently, for admission purposes. Even though the piece of bone appeared to the witnesses to be slightly darker than it was at the time of the preliminary

hearing, Dr. Reese testified that it appeared to be the bone found in the deceased's cranial cavity; that it compared in size and shape with the hole in the skull; and that in his opinion it was the piece of bone taken from the body of the deceased at the time of the autopsy.

We need say little about the third proposition argued by appellant. This assignment of error raises the inadmissibility of the evidence showing the commission of other crimes by the defendant. With the possible exception of the stealing of the Packard automobile in Denver, Colorado, all other offenses were directly connected with and related to the principle crime charged. The disposition of the property of deceased, the forging of deceased's name to certain documents, and the stealing and selling of the personal property are admissible for many reasons. These facts and circumstances are relevant to establish a motive for the killing, to identify the defendant as the perpetrator of the crime, to discredit defendant's claim of killing in self-defense, and to show an attempt on the part of defendant to conceal the crime and to prevent an identification of the deceased. A relevant fact does not become incompetent because it may tend to establish another and separate crime. The evidence of the theft of a car in Denver was contained in a written statement made by defendant to F. B. I. agents, and while admission of the complete document was objected to, no effort was made to separate the one statement, claimed to be incompetent and prejudicial, from the remaining part of the statement because of its reference to a separate crime. Furthermore, defendant introduced in evidence an exhibit which consisted of written notes taken by the F. B. I. agent, during the time of a conversation with defendant, and the conversation as recorded in these notes contained the admission, as made by defendant, that the car was stolen in Denver.

Defendant in his next assignment of error asserts only the inadmissibility of alleged confessions made by defendant to P. H. Neeley, the Summit County Attorney, while defendant was incarcerated in the Weber County jail, and

while he accompanied Neeley and other law enforcement officers on a drive over the route he travelled on the night of the killing. We have extended the grounds to include state's exhibit "P" which is the written statement given to the F. B. I. officers as Neeley was present during part of the time this statement was being obtained.

Counsel for the state has discussed this assignment of error from the standpoint of the difference in procedure when the court is dealing with an admission made by the defendant and when the court is considering a confession given by the defendant. For the purpose of this action, we are content to treat defendant's written and oral statements while in custody and his acts and conduct in guiding the police officers along his route of travel as a confession. They are all part of a continuous transaction, and when pieced together they amount to a declaration by defendant of his commission of a crime.

The defendant at the time of his arrest on the 16th day of August, 1946, was approaching his nineteenth birthday. He had been inducted into the army and for some short time before his arrest had wandered about the inter-mountain country. When he was arrested he was confined in the Weber County jail at Ogden, Utah. The day following his arrest he was shown to various Ogden residents in an effort to identify him as the person who, on June 24th, had sold deceased's 1937 Ford automobile. Apparently a young man by the name of Young identified the deceased as the seller of the car. Neeley, who was representing the State of Utah, notified the defendant that he would be required to file a complaint for stealing the car. Shortly afterwards, according to Neeley, defendant stated he was willing to admit the theft, and Neeley told him that he should not make any admissions to him but should wait until his father, mother, or a lawyer were obtained. The defendant told Neeley he did not want a lawyer and did not want his father or mother notified. Subsequently, but after the confession was obtained, Neeley notified the defendant's father and a lawyer represented the defendant at the preliminary hear-

ing. However, no lawyer was consulted or made available to defendant prior to his giving his statement to the various officials.

Two special agents of the F. B. I. interviewed the defendant on August 18, 1946, and this interview lasted from about 2:30 p. m. to 7:00 p. m. During this discussion the deceased told his story to the agents and notes were taken by one of the interviewers. Using the notes to assist in preparing a completed story, one of the agents dictated the information given into narrative form and this statement is identified as state's Exhibit "P," and is the written confession herein discussed. After the stenographer completed typing the confession, the same was given to the defendant to read and to sign. He read and signed each page of the statement, although at the time of trial he claimed not to have read it carefully.

After the written confession was signed, the witness P. H. Neeley, around 10:00 p. m., asked the defendant if on the following day he would guide certain officers including himself over the route he had taken on the night of the killing. Defendant agreed to do so, and on the following morning the defendant, in one car with several peace officers and other officials in a second car, journeyed over the route; and as they arrived at the various places where events had transpired, the defendant pointed out the location and told what he done at each place. The places of importance pointed out by defendant were those where he had stopped to throw away the gun, the deceased's clothes, and identification bracelet; the place where the body had been left; and the place where defendant fired the fatal shot.

In connection with the procedure leading up to the admission in evidence of the various incriminating statements made by defendant, counsel for defendant objected to their introduction on the grounds that the same were incompetent, irrelevant, and immaterial, and that no proper foundation had been established to admit them into evidence. The record indicates numerous and similar objections made by counsel for appellant, but there is not a single instance

indicated in the record when the appellant specifically directed the trial judge's attention to the fact that the "lack of foundation objection" involved the claim that the confession was not voluntary. This is adverted to only to illustrate that the trial court was never advised that it might be necessary to hear evidence in the absence of the jury, touching on the question of whether or not the confession was voluntarily given. It appears logical that if the facts, circumstances, and statements of the state's witnesses indicate voluntary action on the part of the defendant, that the court should not be required to excuse the jury for the purpose of permitting the court to determine an issue unless some contention is advanced by the defendant that there is an issue of fact involved.

Appellant, to sustain this contention, relies on a number of cases decided by this court. The first one is *State* v. *Wells,* 35 Utah 400, 405, 100 P. 681, 683, 136 Am. St. Rep. 1059, 19 Ann. Cas. 631, and we quote from that case:

"We think many of the courts which hold that the question of voluntariness on conflicting evidence is for the jury in effect reached the same conclusion. We are therefore of the opinion that, when evidence of the defendant's confession is offered by the state, it, on the defendant's objection, must first introduce some evidence tending to show that the confession was voluntary; that it is alone within the province of the court to determine, not whether the confession was or was not voluntary, but whether a sufficient prima facie showing, with respect to its voluntariness is made to warrant a finding that it was voluntary; that, before the court rules upon the question, the privilege should be given the defendant, if he requests it, to cross-examine the witness, or witnesses, by whom the state seeks to show the voluntariness of the confession; that when such a showing has been made, and the court determines that it is prima facie sufficient to authorize such a finding, then the court should admit the confession itself in evidence, otherwise not;   *   *   *."

This principle, that upon objection by defendant the state must make a prima facie showing of voluntariness, was reaffirmed in the case of *State* v. *Dunkley,* 85 Utah 546, 571, 39 P. 2d 1097, 1108, in the following words of Mr. Justice Straup:

242

"Now as to the admissibility of the so-called confession. Upon objections made, the burden, of course, was upon the state to first show that the confession was the voluntary statement of the accused, without any promise of reward or immunity or threat or coercion. The rule in such particular and as to the procedure, to be followed in making a prima facie showing of voluntariness by the state before admitting the confession, and the function which the court and the jury perform in the matter, is stated in *State* v. *Wells*, 35 Utah 400, 100 P. 681, 136 Am. St. Rep. 1059, 19 Ann. Case. 631. Such preliminary matter and prima facie showing was heard, as it could be, before the court in the absence of the jury. At the conclusion of such hearing, the court ruled that a sufficient prima-facie showing was made to admit the so-called confession in evidence. We think no error was committed in such particular.  *   *   *"

Appellant asserts that these authorities sustain his contention that before any part of the statements made by defendant, either oral or in writing, should have been admitted in evidence, the trial court should have excused the jury and determined the voluntariness of such statements. We wonder why a trial court should excuse a jury to pass on a question of fact when no claim of any kind is made that there is any dispute. Counsel for appellant never at any time, so far as appears from the record, disclosed to the court that there was any question about the statements being involuntary. While an objection that "no proper foundation has been laid" should warn the judge to determine all the legal questions which may be covered by such an objection, it can hardly be contended that this is sufficient to require him to excuse the jury to determine a question of fact which has not been suggested.

We do not advance this though as a reason for overruling the principle that the state must make a prima facie showing that the confession was voluntary upon appropriate objecttion by the defendant. We suggest it as a reason why the trial court did not suspect there might be an issue of fact and did not require additional evidence on the part of the state. In the cases cited by counsel for appellant, the court in each instance was advised in the objection that the defendant claimed the confession was involuntary and the

court then heard evidence touching on this issue. Be that as it may, neither appellant nor respondent here refer to the case of *State* v. *Crank et al.*, 105 Utah 332, 142 P. 2d 178, 195, 170 A. L. R. 542, which most nearly answers the question raised in this issue, and which, in part, overrules the previous cases cited. In that case the controlling opinion states the law to be as follows:

"* * * Thus the State has the burden of persuading the court that the confession was voluntary by a preponderance of all of the evidence on that question. An examination of the authorities discloses that there are many different views on this subject. Wharton's Criminal Evidence, 11th Ed., Vol. 2, p. 986, Sec. 595, states:

" 'Most authorities and jurisdictions have asserted the rule that a confession sought to be introduced into evidence is presumed to be voluntary. This is equivalent to statements made by some courts that the confession is prima facie admissible.'

"In Wigmore on Evidence, 3rd E., Vol. 3, Sec. 860, it is stated that five distinguishable attitudes are found represented in the rulings in regard to this matter. They are listed as follows: [We omit part of the quotation]

\* \* \* \* \*

" '(5) A modern English Ruling takes a middle path, and seems to receive the confession unless attacked by evidence of an improper inducement and then in case of doubt leaves upon the prosecution the burden of convincing the court of the admissibility.'

"It is our opinion that paragraph (5) of the above quotation from Dean Wigmore's Evidence states the better rule."

When a confession is attached by evidence of an improper inducement, the function of the court and the jury in determining whether it was voluntary is delineated by the court in the case of *State* v. *Crank,* supra. The opinion at page 373 of 105 Utah Reports, page 196 of 142 P. 2d, is as follows:

"* * * We agree with the rule approved in those cases, (herein cited) that a confession is not admissible in evidence unless it was voluntarily made; that this question must be determined by the court from all of the evidence from both sides bearing thereon; that if the court is satisfied from the evidence that the confession was voluntary, then the court admits the confession in evidence to the jury, together with all of the evidence on the question of whether it was voluntary,

and the circumstances surrounding its being made, and from such evidence the jury must determine the weight and credibility to be given it, but may not determine its competency as evidence, that being a question for the court. * * *"

In this case the evidence of the facts and circumstances surrounding the confession were obtained from the state's witness. There is no conflict in the testimony as to the methods employed to obtain the confession as the defendant did not testify to this nor does he now claim any abuse, threats, coercion, promises of reward or immunity, nor even excessive zeal on the part of the interrogating officer. He does, however, contend that in view of the defendant's youth, coercion was present because the two F. B. I. agents were discussing the matter with the defendant for some four and one-half hours, from 2:30 p. m. until 7:00 p. m.; because later that evening at approximately 10:00 p. m., Neeley asked the defendant if he would direct the officers over the course he had travelled the night of the killing; that because defendant was accompanied by a number of officers while taking the trip, and finally, because defendant was not furnished with or informed that he should consult with counsel before making the statements to the officer. Following the rule in the case of *State* v. *Crank,* supra, can we say that the evidence in this case suggest the use of improper inducements to obtain the confession?

Mr. Justice Frankfurter in the recent case of *Haley* v. *State,* 332 U. S. 596, 68 S. Ct. Adv. 302, 305, makes the following statement about an admission obtained from a fifteen-year-old boy:

"But whether a confession of a lad of fifteen is 'voluntary' and as such admissible, or 'coerced' and thus wanting in due process, is not a matter of mathematical determination. Essentially it invites psychological judgment—a psychological judgment that reflects deep, even if inarticulate, feelings of our society. Judges must divine that feeling as best they can from all the relevent evidence and light which they can bring to bear for a confident judgment of such an issue, and with every endeavor to detach themselves from their merely private views. * * *"

What feeling can we divine from the relevant evidence in this matter? If we were convinced that the confession was wrung from a child by a means that the law cannot sanction, then we would be duty bound to hold the court erred. If, however, the confession was obtained in a manner and by such methods as are consistent with the proper detection of crime and determination of guilt, then our duty is to sustain the trial court. We have overlooked neither the defendant's youth nor the fact that he was in custody at the time the statements were made. We are, however, cognizant of the fact that many of the crimes of violence are now being committed by minors, and we are impressed in this connection, with certain of the statements made in the dissenting opinion in the case of *Haley* v. *State,* supra. Mr. Justice Burton in that opinion makes the following observations:

"* * * It is necessary to recognize, on the other hand, that the offense here charged was not an ordinary juvenile offense. It was a capital offense of the most serious kind. It involved the same fatal consequence to a law-abiding citizen of Canton as would have been the case if it had been committed by adult offenders. An obligation rests upon the police not only to discover the perpetrators of such crime, but also to determine, as promptly as possible their guilt or innocence to a degree sufficient to justify their prosecution or release. It is common knowledge that many felonies are being committed currently by minors and an obligation attaches to law enforcement officials to punish, prevent and discourage such conduct by minors as well as by adults. If Haley's part in this crime had been reasonably suspected by the police immediately after its commission at midnight, October 14, the police would have deserved severe criticism if they had not arrested and questioned him that night. The same obligation rested on them, five days later, at midnight, October 19."

We therefore approach the issue in this case from the correlative rights of the state to discover the perpetrator of the crime and the right of the defendant to be free from unwarranted and unwanted pressure and coercion.

Upon being apprehended the defendant was placed in jail. On the next day he was identified as the person who had sold deceased's automobile. When he admitted the theft

he was told by Neeley not to make any incriminating statements to him as he would be required to prosecute him. That, at the time, Neeley suggested his father or mother or a lawyer be notified. This suggestion was rejected by the defendant, who said he did not want a lawyer and he did not want his father or mother notified. There is no evidence that defendant was held incommunicado or that any request of his was refused. On the 18th of August, 1946, the F. B. I. agents interviewed him and informed him who they were; that he was not required to make a statement and if he did it would be used against him. The defendant told his story to the agents and notes were made. These notes were used by the agents to transcribe the story into narrative form. The narrative was prepared with the following first paragraph:

"I, Eliseo J. Mares, Jr., make the following statement to David W. Murray and J. Eldon Dunn, who have identified themselves to me as Special Agents of the Federal Bureau of Investigation. I make this statement voluntarily of my own free will, in the presence of Sheriff George M. Fisher of Summit County, Utah; Sheriff Bernard Dahlquist, Morgan County, Utah; Captain Clifford K. Keeter, Ogden City Police Department; and P. H. Neeley, County Attorney of Summit County, Utah. No threats or promises have been used to induce me to make this statement, and I know that it can be used in a Court of Law against me."

As previously indicated on the evening of August 19, 1946, defendant was asked if he would guide the officers over the route taken by him. This he agreed to do, and the only evidence in the record that during the complete trip he was confronted with importunities to say anything, was that at one point, when the defendant hesitated, the Sheriff of Morgan County stated:

"Sometime you will have to meet this anyhow."

The defendant took the witness stand and gave his version of the killing. He was examined and cross-examined with respect to his confession and yet not one bit of evidence was offered by him which in any way indicated that he had been

coerced or induced to sign the confession by inhuman treatment, long incarceration, abuse, threats, promises, excessive zeal or any third degree methods sometimes employed by some police officers. Giving defendant every benefit of the doubt, the most that can be suggested in the way of unfair advantage was that he was not told he could have counsel, that he was being questioned by two federal officers over a period of approximately four and one-half hours, he was incarcerated, and finally he was overawed by the number of officers.

Defendant was charged with murder in the first degree on the 21st day of August, 1946. He was brought before the committing magistrate on the same date and his preliminary hearing set for August 28, 1946. On this date he was brought before the Justice of the Peace and announced in open court that he did not desire counsel. The Justice of the Peace refused to proceed with the hearing in the absence of counsel, continued the hearing to a later date, and requested the district court to appoint counsel. This was done, but prior to the hearing, present counsel had been employed, and represented the defendant during all of the proceedings.

In our opinion the record discloses that the defendant was not made a victim of fear or panic or an object of police abuses. He was not offered immunity, reward or consideration. Considering all facts and circumstances we believe that the defendant was not denied his freedom of choice, that the confession was voluntary, and that the court did not err in admitting either the various parts of or the completed confession into evidence.

Defendants fifth contention is that the court misinstructed the jury. A reading of the instructions as a whole leads us to a contrary conclusion. The complaints most seriously stressed by defendant attack Instruction No. 18 dealing with the presumpion of malice from the use of a deadly weapon and Instruction No. 20, dealing with the right of a person to protect himself. Insofar as Instruction No. 18 is concerned, this court in the case of *State* v. *Vasquez*, 101 Utah 444, 121 P. 2d 903, 140 A. L. R. 755,

considered an identical instruction. It was there held not erroneous and the reasons announced in that case compel a similar holding in this case.

Instruction No. 20 as given was as follows:

"You are instructed that under the law of the State of Utah not every killing is murder or even a crime. If a human being kills another in self-defense or to protect himself against great bodily injury *which could not otherwise be avoided,* then in the eyes of the law such a killing is justifiable or excusable, and no crime has been committed." (Italics added.)

The defendant complains because he contends the italicized portion required the defendant to retreat before he can claim self-defense. This argument disregards Instruction No. 22, which specifically provides

"that a person assailed need not flee or retreat, that he may stand his ground and use all necessary force to protect his person from great bodily harm."

The instructions must be considered together and when so considered, defendant's criticism fails.

The last assignment deals with prejudicial remarks made by the District Attorney in his arguments to the jury. We are not required to place our stamp of approval or disapproval on the comments. We are convinced they were remarks which could be inferred from the evidence presented to the jury. Typical of the statements made and objected to by appellant is this one:

"As I said, he was an outlaw away from the Army without leave. He had stolen a Packard at Denver and he had to have some money."

The remarks were within the framework of the record and we are not confronted with the situation found in the case of *State* v. *BeBee,* 110 Utah 484, 175 P. 2d 478. In that case the prosecutor went far beyond the evidence in the record. He made accusations neither in the record nor fairly inferable therefrom. Not so here.

We have carefully considered the other assignments of error presented by the defendant, and find that, if any errors were committed by the trial court, they were not prejudicial. From a consideration of the complete record, we are convinced that defendant's rights were adequately protected. The judgment and conviction are affirmed.

We concurr.