## MARES v. HILL

No. 7353. Decided October 7, 1950. (222 P. 2d 811.)
Rehearing denied November 10, 1950; Certiorari denied by
U. S. Supreme Court May 14, 1951.

See 6 C. J. S. Constitutional Law, Sec. 589. In effecting release by habeas corpus lack of due process must be shown, 52 A. L. R. 869. See, also, 25 Am. Jur. 151.

*McCullough, Boyce & McCullough,* Salt Lake City, for plaintiff.

*Clinton D. Vernon,* Atty. Gen., *Andrew John Brennan,* Asst. Atty Gen., *Bryce E. Roe,* Asst. Atty Gen., for defendant.

WADE, Justice.

Plaintiff instituted this original Habeas Corpus proceeding claiming he is being held without due process of law by the warden of the state prison. He was tried and

convicted of murder in the first degree wherein oral and written confessions were used against him and we affirmed his conviction on appeal. Thereafter, he instituted this proceeding claiming (1) that after his arrest he was not taken before a magistrate without unnecessary delay, as provided by Sec. 105—13—17, U. C. A. 1943; (2) that while he was so held without the advice of counsel, family or friends, he was questioned and made the confessions complained of; (3) that under the surrounding facts and circumstances, these confessions were the result of pressure and coercion and therefore not voluntary. He contends that under such circumstances he is being deprived of his liberty and his life threatened without due process of law under Article 1, Section 7, Constitution of Utah, and Section 1 of the Fourteenth Amendment to the Federal Constitution.

Plaintiff argues the same points now that he argued in his case on appeal. He then claimed they were prejudicial errors, but now claims they constitute a lack of due process of law. If there was no error in the trial, there cannot be a lack of due process of law for a trial which is so lacking in the fundamentals of justice that it does not constitute due process of law must contain error. But plaintiff contends that since our decision the Supreme Court of the United States has construed the Federal Constitution so as to require a holding here that there was lack of due process of law in his trial. See *Watts* v. *Indiana*, 338 U. S. 49, 69 S. Ct. 1347, 93 L. Ed. 1801; and *Turner* v. *Pennsylania*, 338 U. S. 62, 69 S. Ct. 1352, 93 L. Ed. 1810; and *Harris* v. *South Carolina*, 338 U. S. 68, 69 S. Ct. 1354, 93 L. Ed. 1815. This court is bound by the construction of the Federal Constitution placed thereon by the Supreme Court of the United States, and if our previous decision is contrary to that construction, we are anxious to correct it.

We adopt the special referee's findings, together with

all additional statements of facts in this opinion. For a more detailed statement of the facts, see *State* v. *Mares*, 113 Utah 225, 192 P. 2d 861.

To present a picture of the situation as it existed at the time of plaintiff's arrest, a review of the facts as they were then known is necessary. About June 18, 1946, Jack D. Stallings, an ex-navy man, left his home in Corning, Ohio, in a gray 1937 Ford two-door sedan for California for the purpose of marriage. On July 9, 1946, his body was found in an irrigation canal near the transcontinental highway in the mountains east of Salt Lake City. He had a bullet hole in his forehead and appeared to have been dead for about two weeks. Shortly thereafter, his car was located in Ogden, Utah, in the possession of a bicycle shop operator named Wistisen, who on June 25, 1946, purchased the car from a stranger claiming to be Stallings, who acknowledged the transfer of the car before the desk sergeant of the Ogden City Police Department. It was also discovered that on that same day a Western Union money order for $35.00 sent to Stallings from San Jose, California, by his fiancee had been cashed at Ogden by a person using Stallings' identification papers and tags. On August 16, 1946, Wistisen saw plaintiff in Ogden and recognized him as the man who had sold Stallings' car to him. In response to Wistisen's call, the police department took plaintiff into custody, whereupon plaintiff denied Wistisen's accusations that plaintiff had sold him Stalling's car, claiming that he had never seen Wistisen before. That night, plaintiff was booked at the police station and told they wanted to do a little investigating.

Stallings' body was found in Summit County about fifty miles southwest from Weber County in which Ogden City is located where plaintiff was arrested. Morgan County is located between those two counties. Mr. Neeley, County Attorney of Summit County, was notified of the arrest and the next day, a Saturday, came to Ogden and brought

to the jail some people who, on June 25th, had met the person who sold Stallings' car to Wistisen to see if they recognized plaintiff' as the person who sold the car. Mr. Neeley had plaintiff walk from a side room where these people could see him. A sixteen-year-old boy hesitatingly identified him, whereupon plaintiff swore, and the boy then said, "Now I know you are the man that sold that car." Neeley then told plaintiff he would have to charge him with stealing that car. Neeley further testified:

"* * * We sat there. It was late. I got up and said: 'Have you anything further to say?' He said 'No'; and when we were ready to leave he said to me: 'Come here.' * * * I went over there and he said: 'I stole that car.'"

"I said: 'Wait a minute, my boy. Let me get your parents. Let me get your father and your mother and a lawyer, a friend. Haven't you somebody?' I said: 'Don't tell that to me, because I will use it against you'; And he said: 'No,' he did not want anybody to know anything about it. He did not want a lawyer. He did not want his father or mother; and after that he at times said he did not want them to know a thing about it."

"As I remember, on the 22nd of August, against his will, I wrote to his father and told him the predicament that his son was in."

The statement by plaintiff that he stole that car was not only voluntary but volunteered. The next day, a Sunday, two FBI men came and interviewed plaintiff about stealing the car. They told him that he did not have to talk but if he wished to they would reduce what he said to writing, to which plaintiff agreed. According to these agents, the ensuing conference lasted at most four and one-half hours. One agent said from 2:30 to 7:00 p.m.; the other from 2:00 to 5:30 or 6:00 p.m. The details of what happened during that conference are somewhat meager. Neither at the trial nor the preliminary hearing did plaintiff object, on the grounds that they were not voluntary, to the introduction of these confessions, so the state had no occasion to prove them to be voluntary by showing the detailed surrounding facts and circumstances under which they were made. At the trial, plaintiff was a

witness on his own behalf and both at the trial and preliminary hearing, by counsel, he extensively cross-examined each and every witness to any part of these confessions but he did not develop the detailed facts or circumstances under which they were given. He emphasized over and over again that plaintiff was a young boy without the advice of counsel, family or friends.

On cross examination of agent Dunn, plaintiff developed that Dunn had taken 17 pages of long-hand notes on what plaintiff said during this interview. These notes were preserved and plaintiff had them read into the record at the trial. Mr. Dunn testified that the first part of these notes consisting of 10 pages was taken before plaintiff admitted the killing, and the last 7 pages thereof covered his statements after he had admitted the killing and had stated that his previous statements were in part untrue. From the notes covering plaintiff's statements prior to admitting the killing, he told of his birth, childhood, schooling, registration for the draft, marriage, induction into the army, birth of his child, and absence without leave from the army on April 29, 1946. He also gave many names of employers and places of employment, both before and after he was drafted. This part is covered by ten pages of the notes. The last page of the first part of notes covers his coming to Ogden looking for a car to steal, finding Stallings' car with the keys and identification papers in it and selling that car to Wistisen, and cashing the Western Union money order, by posing as Stallings and using his papers for identification. At this point, according to the evidence, he broke down and confessed the killing. Thereafter, the notes follow closely the written confession. There is nothing in the notes or any of the evidence in this case indicating that his confessions were the result of urging, cross-examination or other pressure after plaintiff told of selling the car and cashing the money order before he admitted the killing.

The interview with the FBI agents covering a possible four and one-half hours was divided into three periods: (1) while alone with two FBI agents he told his story before the confession; (2) he revised his version after he had confessed the crime; and (3) the FBI agents dictated the confession with plaintiff's collaboration to a stenographer in the presence of County Attorney Neeley, Officer Keeter and Sheriffs Fisher and Dahlquist. If these confessions were the result of coercion, it occurred during the first of those three periods which were obviously only a small fraction of the four and one-half hours of the interview.

After the confession had been transcribed, plaintiff and the persons who had witnessed it reassembled at the Ogden police station where the confession was handed to plaintiff which he signed after appearing to read it. Plaintiff then agreed to take the officers the next day over the road traveled by him from the place of the shooting until he reached Salt Lake City. This he did the next morning, pointing out the various places wherein important incidents occurred. Plaintiff argues that because this trip was not authorized by a court order, the confessions which he made to the officers at that time are not admissible in evidence. There is no statute or rule of practice which requires an order before taking a prisoner to the scene of his crime. At that time it was not certain whether the shooting occurred in Morgan or Summit County and it was necessary to have him point out the place where the shooting occurred in order to determine in which county to prosecute.

The record is devoid of any evidence that pressure was exerted to induce these confessions. Plaintiff made no claim either by his own evidence or by objection to their admission that they were involuntary or that they were induced by threats, promises, misrepresentations, personal discomfort or long periods of questioning. There is no claim that his sleep or rest was ever interfered with;

that his quarters were not comfortable, that he ever lacked food or was subject to grueling relays of long questioning or that he was in any way mistreated, either physically or mentally. It is true he did not have the advice of a lawyer or of his family or friends until after the confession, but that he should have them was suggested to him a number of times and his response thereto was that he did not want the advice of counsel, or his family or friends to know what he had done. In *State* v. *Crank*, 105 Utah 332, 142 P. 2d 178, 170 A. L. R. 542, the majority of this court in a concurring opinion held that a confession should be re-received unless attacked by evidence of improper inducement, and then in case of doubt the burden is on the prosecution to convince the court that it was given voluntarily. Accordingly, we hold that in the absence of evidence we will presume that the circumstances surrounding these confessions were proper.

Plaintiff was not taken before a magistrate until August 21, 1946, less than five days after his arrest. He was not furnished counsel until August 30, 1946, but from August 19th to the time he was furnished with counsel, no proceedings were had against him except to take him before the committing magistrate and no further confessions or interviews occurred. On August 28, the committing magistrate arranged to have counsel appointed for plaintiff over his protest and his parents were notified against his wishes.

If the use of a confession under such circumstances renders his trial a lack of due process, it must be: (1) because he was not taken before a magistrate without unnecessary delay, though the confessions were obtained within three days after his arrest, and the last confession was obtained in determining in which county he should be prosecuted; (2) because the officers did not insist on his consulting a lawyer, family or friends before he was interviewed; or (3) because under these circumstances a

statement is involuntary though made without hesitation, protest or objection after a short period of questioning and without the use of any force, threats, fear or misrepresentation or other high pressure methods, and after he had been repeatedly told that he did not have to talk. We will consider these propositions in the above order:

(1) Does the fact that plaintiff was held nearly five days before being taken before a magistrate render his conviction by the use of these confessions a lack of due process of law? The first three days of plaintiff's ■ incarceration were spent in necessary preparation for the prosecution. Until plaintiff pointed out the spot where the shooting occurred, it was not certain whether plaintiff should be prosecuted in Morgan County or Summit County. Plaintiff was arrested Friday evening, August 16, 1946. The next day the Summit County attorney came to Ogden and interviewed him and plaintiff confessed that he had stolen decedent's car. The next day, which was Sunday, after a short interview with FBI agents, he confessed the killing, thereby presenting the problem of determining in which county the shooting occurred. This problem was not determined until Monday when he pointed out the place of the shooting to the officers. Had he been taken before the magistrate the next morning, the requirements of the statute that he be taken before a magistrate without unnecessary delay would have been satisfied. Only one day intervened thereafter before he was taken before the magistrate. Such delay does not render his confessions which were made before the unnecessary delay commenced inadmissible in evidence. In the case of *United States* v. *Mitchell*, 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 1140, it was held that the fact that one under arrest was held for several days without being arraigned does not render inadmissible in evidence against him, confessions made shortly after being taken into custody. In the Watts, Turner and Harris cases, one justice suggests that the mere lapse of

time alone is sufficient to render a trial a lack of due process where the confession obtained during such period of unnecessary delay is used against the accused. But that opinion does not suggest that a confession obtained before the period of unnecessary delay began would have that effect. None of the other members of the court joined in that suggestion. We therefore conclude that the plaintiff cannot prevail on this ground.

This case is distinguishable from *McNabb* v. *United States,* 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819. In that case the Federal Supreme Court was dealing with a federal rule of procedure and whether there had been prejudicial error in failing to bring the accused without unnecessary delay before a magistrate. On the question of whether error had been committed, this court is the court of last resort in this case and we have already determined that question against plaintiff. Here plaintiff must show more than mere error in the trial—he must show a lack of due process of law which is much more limited in its scope than error. See *Watts* v. *Indiana,* supra, and *United States* v. *Mitchell,* supra.

(2) Does the fact that plaintiff's confessions were made without the advice of counsel, family or friends render his conviction a lack of due process? In the Watts, Turner, Harris cases. supra, this question was posed and answered contrary to plaintiff's contention by one of the justices, three other justices dissented in all of those cases thus deciding contrary to the plaintiff's contention, and one other concurred in the result on the authority of *Chambers* v. *Florida,* 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716, and *Ashcraft* v. *Tennessee,* 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192, which held that the confessions were involuntary. So at least a majority of the court held against the plaintiff on this point. In each of these cases the prisoner broke down and confessed only after days of long relays of questioning, wherein he was subjected to

physical discomforts and disregard for the rudimentary need of life with fear and intimidations exerted, all of which were calculated to break his resistance. In view of this situation we think the opinion of the court in each of these cases is based on the fact that the confession under all the facts and circumstances was involuntarily made and the fact that the defendant was questioned without first consulting with counsel, family or friends was merely one of those circumstances. Although the following excerpts from Justice FRANKFURTER'S opinion in the Watts case, supra, might be construed to the contrary:

> "To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process.
>
> * * * * * *
>
> "Ours is the accusatorial as opposed to the inquisitorial system. * * * Under our system society carries the burden of proving the charges against the accused not out of his own mouth. It must establish its case, not by interrogation of the accused even under judicial safeguards, but by evidence independently secured through skillful investigation." [338 U. S. 49, 69 Sup. Ct. 1350.]

Though, where an accused person is questioned and confesses without the advice of counsel, family or friends, if that confession may be used against him in the trial, then the damage cannot be undone by receiving such advice later, still we think that in the interest of efficiency in detecting crime and under the above decisions, these confessions were not inadmissible on this ground.

Were these confessions involuntary? If there was coercion it resulted from the fact that he was young and easily coerced, that he talked freely with the officers without first consulting counsel, family or friends, and was after very little questioning induced to confess the killing. We have been cited to no case which holds that this amounts to coercion or that a statement made under these circumstances was involuntary. The United States cases

above cited do not so hold. The confession in each of them was made only after days of relayed questioning, physical discomfort, and under circumstances calculated to engender fear and to break the will of the prisoner to resist, and in some of the cases there were positive misrepresentations and threats. Based on that situation, the opinion of the court in the Watts case said:

"A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police .it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here transpired to deny that this was a calculated endeavor to secure a confession through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right."

The confessions here were not the result of pressure by the police, or of being overborne, or the suction process of sustained questioning. The plaintiff was willing to talk, the period of questioning was short, there were no threats, fear or physical discomfort. After he was identified as the person who sold car to Wistisen, and he admitted stealing it, the evidence pointed directly to him as the killer. His attempt to explain how he stole the car and sold it to Wistisen, and also cashed Stallings' money order under the circumstances was doomed to failure because of its inherent improbability. Without these confessions, there was still enough evidence of his guilt to convict him of murder in the first degree.

The application for his freedom is denied and the writ quashed.

PRATT, C. J., and WOLFE, LATIMER, and McDONOUGH, JJ., concur.